UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **DEIRDRE LEANE and IPNAV, LLC,** | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:20-CV-3097-B |
| | § | |
| **UNIFIEDONLINE, INC.** and | § | |
| **CHANBOND, LLC,** | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Plaintiffs Deirdre Leane and IPNav, LLC's Emergency Motion to Extend Temporary Restraining Order (Doc. 3). In their motion, Plaintiffs seek a temporary restraining order (TRO) and a preliminary injunction preventing Defendants UnifiedOnline, Inc. and ChanBond, LLC from settling patent lawsuits currently pending in the United States District Court for the District of Delaware. Doc. 3, Pls.' Mot., 2. After considering the parties' briefing and oral arguments at a hearing held on November 4, 2020, the Court denied Plaintiffs' motion on the grounds that Plaintiffs failed to demonstrate a substantial likelihood of success on the merits of their claims or show irreparable harm. This Order further explains the Court's reasoning.

# I.

# BACKGROUND[1]

Plaintiff Deirdre Leane was the sole owner of Defendant ChanBond, LLC ("ChanBond"). Doc. 5, Pls.' App., 97. In April 2015, Leane—on behalf of ChanBond—executed a patent purchase agreement (PPA) with CBV, Inc., to purchase CBV, Inc.'s telecommunications patents ("the Patents"). *Id.*; *see also* Doc. 30-3, Joint Ex., 156. Leane sought to monetize the Patents by licensing them and recovering in litigation against infringers. Doc. 5, Pls.' App., 97–98.

ChanBond subsequently entered into a service agreement with Leane's other wholly-owned entity, Plaintiff IPNav, LLC ("IPNav"), wherein IPNav agreed to provide "patent monetization consulting" to ChanBond in return for twenty-two percent of the gross proceeds of the Patents, including any recovery in litigation. *Id.* at 97, 99.

On September 21, 2015, ChanBond filed thirteen patent infringement lawsuits against various defendants in the United States District Court for the District of Delaware ("the Delaware Suits"), which are currently pending. *Id.* at 100. ChanBond agreed with its counsel and with a litigation funder that ChanBond would assign each a shifting percentage of any recovery from the Delaware Suits in return for their services. *Id.* at 99–100. Pursuant to those agreements and ChanBond's agreement with IPNav, ChanBond's remaining interest in any recovery in the Delaware Suits ranged from approximately fifteen to twenty-four percent. *Id.* at 100.

On October 27, 2015, Leane sold her ownership interests in ChanBond to Defendant UnifiedOnline, LLC ("Unified") via an interest sale agreement (ISA), in return for a five-million-

---

[1] The facts are drawn from Plaintiffs' motion and the parties' briefing. *See* Doc. 3, Pls.' Mot.; Doc. 4, Pls.' Br.; Doc 11, Defs.' Resp.; Doc. 18, Pls.' Reply; Doc. 25, Defs.' Sur-Reply. Unless otherwise indicated, the Court has omitted the parties' citations to the appendices.

dollar promissory note ("the Note") and a small ownership interest in Unified. Doc. 4, Pls.' Br., 3. The ISA requires Defendants to apply ChanBond's net proceeds, including any recovery in the Delaware Suits, towards paying off the Note before Defendants may retain any portion. Doc. 11, Defs.' Resp., 3. To ensure payment on the Note, the ISA contains an anti-assignment provision that prevents Defendants from "sell[ing], transfer[ring], or spin[ning]-off any of the interests in ChanBond or any of its material assets" without Leane's consent. Doc. 5, Pls.' App., 50. The ISA defines ChanBond's "material assets" as the "assignments related to" the PPA and ChanBond's service agreements with its counsel, litigation funder, and IPNav. *Id.* at 40, 45, 54. The ISA also contains an arbitration clause. *Id.* at 50.

Plaintiffs claim that "almost immediately after executing the ISA, and without Ms. Leane's consent," ChanBond entered into a new service agreement with UO! IP of NC, LLC, and modified ChanBond's agreements with its attorneys and litigation funder. *Id.* at 100–01. In doing so, ChanBond issued additional interests in any recovery from the Delaware Suits, ultimately reducing ChanBond's remaining interest to a range of 9.8 to 16.4 percent. *Id.* at 100–01.

On April 24, 2018, Plaintiffs claim, ChanBond's attorney advised Leane to terminate ChanBond's service agreement with IPNav in order to facilitate the Delaware Suits. *Id.* at 105–06. Leane did so, purportedly under the belief that IPNav's twenty-two-percent interest would be restored through a subsequent agreement. *Id.* at 106. A subsequent agreement was never made. *Id.* at 108–09.

In response to these events, Plaintiffs filed an arbitration demand against Defendants, seeking to rescind the ISA and reinstate IPNav's interest in the proceeds from the Delaware Suits. *Id.* at 114. Plaintiffs then sought an *ex parte* TRO in state court to enjoin Defendants from settling the Delaware

Suits during the pendency of arbitration. *Id.* at 15. The state court entered the TRO; but before it could hold a hearing on whether a preliminary injunction was proper, Defendants removed the matter to this Court. Doc. 4, Pls.' Br., 3. Plaintiffs filed their motion (Doc. 3), seeking to extend the TRO until the Court could hold a hearing. Doc. 3, Pls.' Mot., 1–2. This Court expedited briefing on Plaintiffs' motion and extended the state-court TRO until the Court could resolve the motion. Doc. 10, Order, 1–2. After reviewing the parties' briefing, the Court held a hearing on November 4, 2020, to determine the propriety of the TRO and a preliminary injunction. At the conclusion of the hearing, the Court lifted the TRO and denied Plaintiffs' request for a preliminary injunction.

## II.

## LEGAL STANDARD

"Injunctive relief is an extraordinary and drastic remedy, and should only be granted when the movant has clearly carried the burden of persuasion." *Anderson v. Jackson*, 556 F.3d 351, 360 (5th Cir. 2009) (internal quotations and citation omitted). Specifically, a movant must demonstrate:

> (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest.

*Janvey v. Alguire*, 647 F.3d 585, 595 (5th Cir. 2011) (citing *Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009)). The movant carries the burden of proving all four elements. *Id.*

### III.

### ANALYSIS

*A.     Likelihood of Success on the Merits*

To demonstrate a likelihood of success on the merits, "the plaintiff must present a prima facie case, but need not prove that he is entitled to summary judgment." *TFC Partners, Inc. v. Stratton Amenities, LLC*, 2019 WL 369152, at *2 (W.D. Tex. Jan. 30, 2019) (citation omitted). In their original state-court application for a TRO, and in their breifing, Plaintiffs base their request for injunctive relief upon claims for breach of contract.[2] Doc. 5, Pls.' App., 11–15; Doc. 18, Pls.' Reply, 5–12. Plaintiffs fail to show a likelihood of success on these claims.

A breach-of-contract claim has four elements: (1) "the existence of a valid contract"; (2) the plaintiff's performance or tender of performance; (3) the defendant's breach of the contract; and (4) "damages sustained as a result of the breach." *Innova Hosp. San Antonio, LP v. Blue Cross & Blue Shield of Ga., Inc.*, 892 F.3d 719, 731 (5th Cir. 2018). While the parties do not dispute whether the ISA is a valid contract or whether Leane performed her duties under it, s*ee generally* Doc. 4, Pls.' Br.; Doc. 11, Defs.' Resp.; Doc. 18, Pls.' Reply; Doc. 25, Defs.' Sur-Reply, Plaintiffs fail to demonstrate that Defendants breached the ISA.

Plaintiffs assert that Defendants "have repeatedly breached the anti-assignment provision" of the ISA by issuing interests in the potential recovery from the Delaware Suits and intend "to further breach the anti-assignment provision by settling the [Delaware Suits] without Leane's consent." *See* Doc. 4, Pls.' Br., 4. However, nowhere in the ISA is there a provision that expressly

---

[2] Plaintiffs also bring a claim for fraudulent misrepresentation in their arbitration demand. *See* Doc. 5, Pls.' App., 112. However, in their briefing and at the hearing, Plaintiffs only addressed the likelihood of success on their breach-of-contract claims. *See* Doc. 18, Pls.' Reply, 5–12; *see generally* Doc. 4, Pls.' Br.

limits Defendants' ability to settle lawsuits or otherwise issue interests in the outcome of specific litigations. *See generally* Doc. 5, Pls.' App., 40–53.

Instead, Plaintiffs rely on the broader language of the anti-assignment provision, which states that Defendants may not "sell, transfer, or spin-off any of the interests in ChanBond or any of its material assets without the prior written consent of [Leane]." Doc. 5, Pls.' App., 50. Plaintiffs interpret the anti-assignment provision to "require[] Leane's consent before ChanBond can transfer any interest in its material assets[.]" Doc. 18, Pls.' Reply, 5. Accordingly, Plaintiffs claim that when ChanBond issued additional interests in the Delaware-Suits recovery without Leane's consent, it breached the anti-assignment provision. *Id.* at 10. Further, Plaintiffs argue that because a license is considered a transfer of interest—although not an ownership interest—in a patent, "ChanBond would require Leane's consent before entering into any licenses[.]" *Id.* at 5. They contend that "any settlement of the [Delaware Suits] will inevitably include a license to the ChanBond Patents, or the functional equivalent thereof[.]" Doc. 5, Pls.' App., 11. From Plaintiffs' perspective, therefore, a settlement equates to a license, which equates to an interest in ChanBond's material assets, which Plaintiffs posit is prohibited without Leane's prior consent. Doc. 18, Pls.' Reply, 5. The Court finds that Plaintiffs' interpretation of the anti-assignment provision is over-broad.

As Defendants correctly argue, both the language of the anti-assignment provision and the parties' intent in entering the ISA support a narrower interpretation of the anti-assignment provision. *See* Doc. 25, Defs.' Sur-Reply, 4–9. The provision does not broadly prevent Defendants from unilaterally transferring any interest at all in the Patents. Instead, the anti-assignment provision restricts Defendants' ability to transfer *ownership* of the Patents. Therefore, even if Plaintiffs are correct in their assertion that settling the Delaware Suits would equate to licensing the Patents, the

anti-assignment provision does not prohibit licensing the Patents. Likewise, Plaintiffs' allegations that Defendants issued interests in the Delaware-Suits recovery without Leane's consent, if true, do not establish a breach of the ISA.

First, the language of the anti-assignment provision does not bar the unilateral transfer of "any interest in [ChanBond's] material assets," as Plaintiffs assert. Doc. 18, Pls.' Reply, 5. Instead, the provision prohibits the transfer of "any of the interests in ChanBond or any of its material assets" without Leane's consent. Doc. 5, Pls.' App., 50. The repeated use of "any" indicates that the anti-assignment provision restricts the transfer of any of the interests in ChanBond and restricts the transfer of any of ChanBond's material assets. *See id.* Plaintiffs' interpretation renders the second "any" superfluous, as it would suffice to state that Defendants could not transfer "any of the interests in ChanBond or its material assets." Instead, the second "any" denotes an intention to break the series and prevent "interests in" from applying to "material assets." Therefore, on its face, the language of the anti-assignment provision of the ISA restricts Defendants' ability to transfer ownership interests in ChanBond and to transfer ChanBond's material assets. It does not, however, prevent Defendants from transferring "any interest" in the material assets, such as a license or an interest in the recovery of specific patent infringement suits such as the Delaware Suits.

Second, the parties' apparent intent upon entering the ISA favors this narrower interpretation. The overall purpose of the ISA was to transfer Leane's "entire interest in ChanBond" to Unified in return for the Note and a stake in Unified. Doc. 5, Pls.' App., 40; *see also* Doc. 4, Pls.' Br., 3. According to Plaintiffs, "[t]he only assets of ChanBond are the [Patents], and its only business is the monetization of the [Patents] through licensing and/or litigation." Doc. 5, Pls.' App., 98. Section 2.2.2 of the ISA grants Unified's Chief Executive Officer, William R. Carter, Jr., the "sole

and exclusive authority over the business of ChanBond." *Id.* at 42. Plaintiffs' assertion that Leane retains a veto right over licensing the Patents and settling the Delaware Suits does not comport with the transfer of Leane's "entire interest in ChanBond" or with Carter's "sole and exclusive authority over the business of ChanBond." *See id.* at 40, 42. If Leane could veto a license or settlement—ChanBond's "only business"—the anti-assignment provision would undercut Unified's ownership of ChanBond and Carter's authority over ChanBond's business. *Id* at 98.

Third, as Leane conceded at the hearing, the anti-assignment provision was included in the ISA for the limited purpose of ensuring payment on the Note. *See also* Doc. 4, Pls.' Br., 3–4. The Court's interpretation of the anti-assignment provision accords with that purpose. Preventing Defendants from assigning ownership interests in ChanBond or assigning the Patents without Leane's consent helps ensure ChanBond's viability while the Note remains unpaid. Under Plaintiffs' interpretation, however, the anti-assignment provision would burden Defendants' ability to make payments on the Note. Most obviously, Plaintiffs' interpretation would mandate the additional step of obtaining Leane's consent before ChanBond could monetize the Patents by settling the Delaware Suits. And while Plaintiffs challenge ChanBond's ability to unilaterally assign interests in the potential recovery in the Delaware Suits, it is unclear how ChanBond could monetize the Patents without first securing Leane's consent. Since the Patents are ChanBond's "only asset," Doc. 5, Pls.' App., 98, it seems that the only consideration that ChanBond could offer in order to secure litigation services from attorneys, funders, and patent consultants would be some interest in litigation recoveries. Requiring Leane's consent to enter litigation service agreements in this manner would burden ChanBond's ability to even begin the process of monetizing the Patents. The Court's

narrower interpretation of the anti-assignment provision helps ensure payment on the note by ensuring ChanBond's viability, while permitting ChanBond to freely monetize the Patents.

Leane objects to a settlement "below $100,000,000." Doc. 18, Pls.' Reply, 13–14. However, even if Defendants settle the Delaware Suits for as little as $52 million, ChanBond's minimum 9.8-percent interest in the litigation recovery would yield ChanBond over $5 million—the initial value of the Note. *See* Doc. 5, Pls.' App., 102. Here, Plaintiffs' interpretation of the anti-assignment provision would prevent Defendants from settling the Delaware Suits below $100 million, even though a far lower settlement value would ensure payment on the Note—the purpose of the anti-assignment provision. Plaintiffs' interpretation thus goes beyond the purpose of the anti-assignment provision.

Lastly, at the time she entered the ISA, Leane knew or should have known that specific language was available to reserve the veto power she now seeks to establish. Indeed, the PPA, the instrument by which Leane originally purchased the Patents for ChanBond, explicitly describes the various "Assigned Patent Rights." *See* Doc. 30-3, Joint Ex. List, 156. One is the right "to recover and collect settlement arrangements, license payments, . . . royalties, and other payments . . . ." *Id.* Another is "the right to make, use and sell products and services under the Patents." *Id.* Leane was aware of the specific rights she held in the Patents prior to the ISA and how they could be separated. Plaintiffs assert that Leane is "an experienced and savvy patent monetization professional." Doc. 18, Pls.' Reply, 16. Therefore, she should have known that the transfer of her entire interest in ChanBond—and thus, in the Patents—would transfer the rights to license the Patents and offer interests in litigation recovery. If Leane wished to reserve a specific right to veto these transactions, she could have explicitly done so.

Based on the Court's interpretation of the anti-assignment provision, Defendants have not breached the ISA by assigning away interests in the recovery of the Delaware Suits and will not breach it simply by settling the lawsuits. The PPA granted ChanBond ownership rights in the Patents, including "all rights to recover and collect settlement arrangements [and] license payments . . . ." Doc. 30-3, Joint Ex., 156. Leane granted these same rights to Unified when she sold her interests in ChanBond. In some instances, an exclusive license may rise to the level of an assignment of an ownership interest since the owner effectively loses the right to further license or control the patent. *See Resonant Sensors Inc. v. SRU Biosys., Inc.*, 651 F. Supp. 2d 562, 571–75 (N.D. Tex. 2009). However, where a patentee grants a non-exclusive license, the patentee retains his ownership rights. *See id.* In the present case, Plaintiffs do not claim, and it is not otherwise apparent, that Defendants have granted, or are now offering, an exclusive license that would restrict ChanBond's ownership rights in the Patents. S*ee generally* Doc. 4, Pls.' Br.; Doc. 18, Pls.' Reply. Therefore, even if ChanBond licensed the Patents by settling the Delaware Suits, ChanBond would be exercising its rights under the PPA—not assigning them away. Likewise, while issuing an interest in the Delaware-Suits recovery may be considered an assignment of an interest in the Patents, it does not rise to the level of an assignment of an ownership interest in the Patents.

In light of the Court's interpretation of the anti-assignment provision, Plaintiffs' allegations do not amount to breaches of the ISA. Therefore, Plaintiffs have not established a likelihood of success on their breach of contract claims.

B.     *Substantial Threat of Irreparable Harm*

Injunctive relief is also improper because Plaintiffs have not shown a substantial threat of irreparable harm. Plaintiffs argue that the threatened harm is irreparable because damages are

- 10 -

difficult to calculate and any judgment against Defendants would be "uncollectible." Doc. 18, Pls.' Reply, 13. The Court disagrees.

Texas law is relevant when considering what could constitute irreparable harm. *See Heil Trailer Int'l Co. v. Kula*, 542 F. App'x 329, 335 (5th Cir. 2013) (per curiam) (holding that the district court erred in failing to consider Texas law when considering injunctive relief). Texas Civil Practice and Remedies Code § 65.011(5) allows for injunctive relief when "irreparable injury to real or personal property is threatened . . . ." But under Texas law, "[i]rreparable injury is . . . an injury of such nature that the injured party cannot be adequately compensated therefore in damages, or that the damages which result therefrom cannot be measured by any certain pecuniary standard." *Canteen Corp. v. Republic of Tex. Props., Inc.*, 773 S.W.2d 398, 401 (Tex. App.—Dallas 1989, no writ) (citation and quotation marks omitted).

Here, damages are easily calculable. First, in their arbitration demand, Plaintiffs seek reinstatement of IPNav's twenty-two-percent interest in the Delaware-Suits proceeds. Doc. 5, Pls.' App., 112–14. If Plaintiffs are successful, damages will be calculated as twenty-two percent of whatever settlement Defendants receive from the Delaware Suits. Second, Plaintiffs claim that a breach of the anti-assignment provision equates to a default event under the Note, entitling Leane to accelerate payment. *Id.* at 100–03. The damages, then, would be calculated as the unpaid remainder on the Note—a simple calculation. Where money damages are available and calculable, harm is not irreparable. *See Alguire*, 647 F.3d at 600 ("In general, a harm is irreparable where there is no adequate remedy at law, such as monetary damages." (citations omitted)).

Moreover, Plaintiffs' assumption that damages would be "uncollectible" does not render the harm irreparable. *See* Doc. 18, Pls.' Reply, 13. "[T]he general rule [is] that contract claims do not

create a right for injunctive relief." *King v. Hawgwild Air, LLC*, 2008 WL 11347424, at *2 (N.D. Tex. Feb. 22, 2008). Irreparable harm means such an injury for which there is "no adequate remedy at law." *Id.* (citation and quotation marks omitted). In *King*, the plaintiff made the same argument that Plaintiffs make here—*i.e.*, if the Court does not grant the request for an injunction, Plaintiffs will never be able to recover from Defendants because Defendants will not have the assets to satisfy a judgment. *Id.* The *King* court found that this was insufficient to show irreparable harm. *Id.* Although in *King* the plaintiff sought to enjoin the defendant from selling an asset, while here Plaintiffs seek to enjoin Defendants from licensing a patent, the point remains the same: injunctive relief in breach-of-contract cases is the exception rather than the rule. *Id.* Thus, "[Plaintiffs] ha[ve] not cited any legal authority to support [their] contention that injunctive relief for a breach of contract claim is appropriate in this case." *Id.*

Finally, Plaintiffs have not shown that the threat of harm is substantial. Though they argue that settlement of the Delaware Suits "could happen at any time," Doc. 5, Pls.' App., 10, nearly five years have passed since Leane transferred her ownership interest to Unified and since Defendants allegedly began issuing additional interests in the Delaware-Suits recovery without Leane's consent. *Id.* at 99–100. It is unclear why the threat is any more substantial today than it was five years ago. Moreover, as Defendants point out, "the first [Delaware] case is not set for jury trial until May 17, 2021, and the Delaware litigants are not actively negotiating." Doc. 11, Defs.' Resp., 4. As Plaintiffs concede, they "cannot say whether [settlement is likely to occur] within a week or a month or a few months . . . ." Doc. 5, Pls.' App., 10. The threatened harm is speculative, at best, and Plaintiffs have not met their burden for the extraordinary relief they seek. *See White v. Carlucci*, 862 F.2d 1209,

1212 (5th Cir. 1989) ("Without question, the irreparable harm element must be satisfied by independent proof, or no injunction may issue").

In light of the monetary damages available for a breach-of-contract claim and the speculative nature of the threatened harm, the Court concludes that Plaintiffs have not shown that they will suffer irreparable harm. Because Plaintiffs fail to demonstrate a likelihood of success on the merits and irreparable harm, injunctive relief is improper.

## IV.
## CONCLUSION

For the foregoing reasons, the Court **DENIES** Leane and IPNav's motion for a TRO and preliminary injunction (Doc. 3).

**SO ORDERED**.

**SIGNED: November 12, 2020.**

_____
JANE J. BOYLE
UNITED STATES DISTRICT JUDGE